## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA (Key West)

| | |
|---|---|
| **BIANCA N. DIGENNARO, as the legal guardian of HMM, a minor,** | Civil Action No.: |
| **Plaintiff,** | **JURY** TRIAL DEMANDED<br>**CIVIL ACTION – LAW** |
| **v.** | District Judge:<br>Magistrate Judge: |
| **MICHAEL L. MALGRAT,<br>KENNETH JW WAITE,<br>FRED C. SIMS,<br>ASHLEY N. HENRIQUEZ,<br>KYLE SHEER,<br>FRAN HERIN,<br>CITY OF KEY WEST, FLORIDA, and<br>MONROE COUNTY SCHOOL DISTRICT,** | |
| **Defendants.** | |

## COMPLAINT

**AND NOW** comes the Plaintiff, BIANCA N. DIGENNARO, as the legal guardian of HMM, a minor, by and through her counsel, DEVON M. JACOB, ESQUIRE, of the law firm of JACOB LITIGATION, INC.; and BENJAMIN L. CRUMP, ESQUIRE, of BEN CRUMP LAW, PLLC; to aver the following:

### JURISDICTION AND VENUE

1.     This action is brought pursuant to 42 U.S.C. § 1983.

1

2.    Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

3.    Venue is proper in this Court, as all parties are located within the Southern District of Florida, and the cause of action arose in the Southern District of Florida.

## PARTIES

4.    Plaintiff, BIANCA N. DIGENNARO ("DIGENNARO"), is an adult individual, who lives in the Southern District of Florida. DIGENNARO is the biological mother and legal guardian of HMM, a minor.

5.    Defendant, MICHAEL L. MALGRAT ("MALGRAT"), is an adult individual, who during all relevant times, was employed by the Key West Police Department, as a police officer. All of Defendant MALGRAT'S actions or inactions were taken under color of state law. He is sued in his individual capacity.

6.    Defendant, KENNETH JW WAITE ("WAITE"), is an adult individual, who during all relevant times, was employed by the Key West Police Department, as a police officer. All of Defendant WAITE'S actions or inactions were taken under color of state law. He is sued in his individual capacity.

7.    Defendant, FRED C. SIMS ("SIMS"), is an adult individual, who during all relevant times, was employed by the Key West Police Department, as a police officer. All of Defendant SIMS' actions or inactions were taken under color of state law. He is sued in his individual capacity.

2

8.     Defendant, ASHLEY N. HENRIQUEZ ("HENRIQUEZ"), is an adult individual, who during all relevant times, was employed by the Monroe County School District and/or Gerald Adams Elementary, as a teacher. All of Defendant HENRIQUEZ'S actions or inactions were taken under color of state law. She is sued in her individual capacity.

9.     Defendant, KYLE SHEER ("SHEER"), is an adult individual, who during all relevant times, was employed by the Monroe County School District and/or Gerald Adams Elementary, as an Assistant Principal. All of Defendant SHEER'S actions or inactions were taken under color of state law. He is sued in his individual capacity.

10.    Defendant, FRAN HERIN ("HERIN"), is an adult individual, who during all relevant times, was employed by the Monroe County School District and/or Gerald Adams Elementary, as a Principal. All of Defendant HERIN'S actions or inactions were taken under color of state law. She is sued in her individual capacity.

11.    Defendant, CITY OF KEY WEST, FLORIDA ("CITY"), owns and operates the Key West Police Department.

12.    Defendant, MONROE COUNTY SCHOOL DISTRICT ("SCHOOL DISTRICT"), owns and operates Gerald Adams Elementary.

## MATERIAL FACTS

13.     MONROE COUNTY SCHOOL DISTRICT ("SCHOOL DISTRICT") operates Gerald Adams Elementary, 5855 College Avenue, Key West, Florida 33040.

14.     During all relevant times, ASHLEY N. HENRIQUEZ ("HENRIQUEZ") was employed by the SCHOOL DISTRICT and/or Gerald Adams Elementary, as a teacher.

15.     During all relevant times, KYLE SHEER ("SHEER") was employed by the SCHOOL DISTRICT and/or Gerald Adams Elementary, as an Assistant Principal.

16.     During all relevant times, FRAN HERIN ("HERIN") was employed by the SCHOOL DISTRICT and/or Gerald Adams Elementary, as a Principal.

17.     During all relevant times, HMM was an elementary school student in the SCHOOL DISTRICT.

18.     SCHOOL DISTRICT conducted a Functional Behavioral Assessment ("FBA"), which resulted in SCHOOL DISTRICT implementing a Positive Behavioral Intervention Plan (PBIP) for HMM.

19.     SCHOOL DISTRICT knew that in February of 2018, HMM was Baker Acted and hospitalized (for less than 24 hours) after making statements of self-harm.

20.    SCHOOL DISTRICT knew that HMM was discharged with a diagnosis of Oppositional Defiance Disorder and Adjustment Disorder with Mixed Disturbance of Emotional Conduct.

21.    In February of 2018, after observing inconsistent academic performances and behavioral difficulties from HMM despite instructional intervention and counseling, SCHOOL DISTRICT conducted a psychoeducational evaluation.

22.    The purpose of the psychoeducational evaluation was to determine appropriate educational programming for HMM and to determine whether HMM met the eligibility definitions for a disability as defined by the Florida Department of Education and IDEA.

23.    On April 30, 2018, SCHOOL DISTRICT initiated an Individual Educational Plan ("IEP") for HMM, which was amended on October 11, 2018.

24.    The IEP noted the primary exceptionality as emotional or behavioral disability.

25.    The IEP noted the aforementioned diagnoses, in addition to a diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD").

26.    The IEP noted the FBA and resulting PBIP.

27.    The SCHOOL DISTRICT and Gerald Adams Elementary classified HMM as having an "Emotional or Behavioral Disability."

28.   The CITY OF KEY WEST, FLORIDA ("CITY") owns and operates the Key West Police Department.

29.   On December 14, 2018, KENNETH JW WAITE ("WAITE"), FRED C. SIMS ("SIMS"), and MICHAEL L. MALGRAT ("MALGRAT"), were employed by the Key West Police Department, as police officers.

30.   Police officers employed by the Key West Police Department are assigned to certain schools in Monroe County, including Gerald Adams Elementary.

31.   The police officers are responsible for the protection and safety of school personnel, property, and students within the school district.

32.   The police officers perform general law enforcement duties, present law-related education programs, identify students displaying early signs of delinquency, and serve as a referral resource for students, faculty, and parents.

33.   On December 14, 2018, MALGRAT was working at Gerald Adams Elementary as a School Resource Officer ("SRO").

34.   On and before the same date, it was known to SCHOOL DISTRICT, HERIN, SHEER, MALGRAT, and HENRIQUEZ, that HMM was "disabled" as defined by the Americans with Disabilities Act.

35.   While SCHOOL DISTRICT policy 5630B permits school employees to use "reasonable physical force" against students "to maintain a safe learning

6

environment," neither the IEP nor the BIP provided for the use of *any* force against HMM.

36.     Rather, to the exclusion of physical force, the BIP listed non-physical responses to be utilized with HMM to maintain a safe learning environment.

37.     Furthermore, neither the IEP nor the BIP provided for the use of police officers, handcuffs, or verbal intimidation, i.e., scared straight tactics, for purposes of behavioral modification.

38.     On or about December 14, 2018, SCHOOL DISTRICT, HERIN, SHEER, and/or HENRIQUEZ, placed HMM in a classroom and lunchroom setting that they knew was not appropriate for his disability.

39.     HENRIQUEZ, who was not HMM's regular teacher and who was not well known to HENRIQUEZ, was assigned to oversee the class.

40.     On December 14, 2018, HMM was 8 years old, only approximately 3 feet 6 inches tall, and 64 pounds.

41.     On the same date, HENRIQUEZ reported to HERIN, SHEER, and/or MALGRAT that HMM had refused to sit on a bench properly despite requests that he do so.

42.     HENRIQUEZ further reported that when HMM refused to comply, she requested that HMM come sit next to her.

43.     HENRIQUEZ further reported that when HMM again refused to comply, she got up, and walked over to him.

44.     HENRIQUEZ further reported that she went hands-on in an attempt to physically move HMM, and as she did so, HMM told her not to put her hands on him.

45.     HENRIQUEZ further reported that when she did not let go of HMM, HMM "punched" her once in the chest with his right hand.

46.     HENRIQUEZ did not report being injured and did not appear to be injured.

47.     Pursuant to school policy, parents are informed that school officials have the right and duty to interview students when investigating crimes, or reports thereof, committed during school hours or on school property without prior notification or presence of parents.

48.     Pursuant to school policy, parents are further informed:

Law enforcement and/or social service officials will be called to the school when laws have or may have been violated and in situations where the safety or welfare of students and/or employees is threatened. In these situations, students may be interviewed by law enforcement and/or social service officials in accordance with all applicable state and federal juvenile laws. When school officials have requested the assistance of law enforcement and/or social service officials in investigating a crime, unsafe or life threatening situation involving students, staff, or district property, the law enforcement and/or social service official has implied permission to interview/interrogate students in school during school hours.

49.     Despite knowing that they were required by state and federal law to conduct a reasonable investigation, which includes interviewing the witnesses at the

scene, and despite knowing that they were permitted to interview him, HERIN, SHEER, and MALGRAT did not interview HMM.

50.    Had HERIN and SHEER interviewed HMM and other available witnesses, and reviewed security video that is believed to have existed, they would have discovered that no crime had been committed, and that police intervention was neither necessary nor appropriate.

51.    Had MALGRAT interviewed HMM and other available witnesses, and reviewed security video that is believed to have existed, he would have discovered that probable cause did not exist to criminally charge HMM with *any* crime; let alone with *felony* battery.

52.    Pursuant to FED.R.CIV.P. 11(b)(3), the following factual contentions will likely have evidentiary support after a reasonable opportunity for further investigation or discovery:

    a.  MALGRAT knew that the aforementioned conduct, i.e., a single no injury punch, would generally not result in a warrantless arrest; and

    b.  MALGRAT knew that the aforementioned conduct, i.e., a single no injury punch, would generally not result in the filing of felony criminal charges.

53.    Regardless, HERIN, SHEER, HENRIQUEZ, and/or MALGRAT, summoned WAITE and SIMS to the school and caused HMM to be taken into custody by WAITE and SIMS.

9

54. SCHOOL DISTRICT, HERIN, SHEER, HENRIQUEZ, and MALGRAT, had a duty not to turn physical custody of HMM over to WAITE and SIMS, but they did so anyway.

55. MALGRAT had a duty not to cause WAITE and SIMS to believe that probable cause existed to arrest HMM for felony battery.

56. While WAITE and SIMS were permitted to rely in good faith on MALGRAT'S representation that probable cause existed to arrest HMM, they were not permitted to use unreasonable force to effect HMM'S arrest.

57. When WAITE and SIMS arrived, HMM was sitting on a bench, in the hallway just outside of the school office. in clear view of HERIN and SHEER.

58. The incident for which WAITE and SIMS had been summoned had ended.

59. HMM was sitting quietly and calmly, and was visibly upset and scared.

60. Regardless, in an attempt to teach HMM a lesson, despite knowing that HMM was not "going to jail" (in the common understanding of that statement), WAITE, SIMS, and MALGRAT, intentionally led HMM to believe that he was going to jail.

61. Specifically, WAITE, SIMS, and/or MALGRAT, stated to HMM, "So you know where you are going? You are going to jail. So you need to stand up and put your hands behind your back."

10

62.   In a further attempt to teach HMM a lesson, despite the fact that HMM was not a physical threat to himself or others, WAITE, SIMS, and MALGRAT, handcuffed and/or permitted HMM to be handcuffed.

63.   Referencing the handcuffs, WAITE, SIMS, and MALGRAT, stated, "You can justify it," and "You can try it."

64.   HMM was so young and physically small, however, that after the handcuffs were applied, it was determined that they were too big and could not be properly used on HMM.

65.   As such, the handcuffs were removed and HMM was told to simply walk with his hands in front of him.

66.   Visibly upset and scared, HMM asked for his dad.

67.   Despite his dad still being in the building, WAITE, SIMS, and/or MALGRAT, told HMM that his dad had left the school.

68.   Before exiting the building, WAITE, SIMS, and MALGRAT stated, "You understand this is very serious, ok? And, I hate that you put me in this position that I have to do this. Ok? Alright? The thing about it is, you made a mistake now it is time to learn from it and grow from it. Right? Not repeat the same mistake again. Ok? Alright."

69.   HMM was then escorted out of the building and to a marked patrol vehicle.

70.    HMM was then permitted to enter the rear seat of the patrol vehicle, without handcuffs, without being searched, and was permitted to put on his own seatbelt.

71.    WAITE, SIMS, and/or MALGRAT then locked HMM in the back of the patrol vehicle.

72.    WAITE and/or SIMS then transported HMM to the adult jail for processing.

73.    A true and correct copy of a video recording of the incident is attached at **Exhibit 1.**[1]

74.    Pursuant to FED.R.CIV.P. 11(b)(3), the following factual contentions will likely have evidentiary support after a reasonable opportunity for further investigation or discovery:

a.  CITY and SCHOOL DISTRICT adopted and implemented policies and procedures that permitted the aforementioned conduct.

b.  In the alternative, CITY and SCHOOL DISTRICT failed to enforce their policies and procedures that would have prevented the aforementioned conduct.

c.  CITY and SCHOOL DISTRICT did not adopt and implement, or did not enforce, policies, procedures and/or training that complied with industry standards regarding criminal investigation, use of force, arrest, policing within an

---

[1] The video is redacted to remove HMM's name and to pixelate HMM's face.

elementary school, policing disabled persons, transportation of juveniles, and/or the processing of juveniles;

     d.  CITY and SCHOOL DISTRICT did not adopt and implement, or did not enforce, policies, procedures and/or training that complied with the Americans with Disabilities Act ("ADA"), regarding the criminal investigation, use of force, arrest, policing within an elementary school, policing disabled persons, transportation of juveniles, and/or the processing of juveniles;

     e.  CITY and SCHOOL DISTRICT discovered the above conduct from school records, written reports, court documents, WAITE, SIMS, MALGRAT, and/or MALGRAT'S body camera video.

     f.  CITY and SCHOOL DISTRICT did not conduct an internal investigation of the incident.

     g.  CITY and SCHOOL DISTRICT did not discipline HERIN, SHEER, HENRIQUEZ, WAITE, SIMS, and/or MALGRAT.

     h.  CITY and SCHOOL DISTRICT did not retrain HERIN, SHEER, HENRIQUEZ, WAITE, SIMS, and/or MALGRAT.

     i.  SCHOOL DISTRICT promoted both HERIN and SHEER.

75.  As a direct result of the Defendants' conduct, HMM suffered a psychological injury that manifested itself physically, i.e., loss of breath, hives, stomach aches, headaches, insomnia, nightmares, and refusal to sleep alone.

## COUNT I

**Plaintiff v. HERIN, SHEER, HENRIQUEZ & MALGRAT**
**Fourteenth Amendment (State Created Danger)**
**Pursuant to 42 U.S.C. § 1983**

76.     Paragraphs 1-75 are incorporated herein by reference.

77.     HERIN and SHEER were school officials who observed the aforementioned events and failed to intervene to stop them.

78.     HERIN and SHEER, as school officials, HENRIQUEZ, as a teacher, and MALGRAT, as a school resource officer, had a special relationship with HMM who was a special needs student in the school.

79.     Specifically, during the school day, they served *in loco parentis* to HMM.

80.     As a result of this special relationship, HERIN, SHEER, HENRIQUEZ and MALGRAT had a duty to protect HMM from injury.

81.     Despite this duty, HERIN, SHEER, HENRIQUEZ and MALGRAT increased the risk that HMM would suffer injury when they caused WAITE and SIMS to be summoned to the school and relinquished custody of HMM to them.

82.     As a direct and proximate result of the Defendants' conduct, HMM suffered and will continue to suffer embarrassment, humiliation, and psychological injury that manifested itself physically, some or all of which may be permanent.

83.     As a direct and proximate result of the Defendants' conduct and the

14

prosecution of this civil litigation, Plaintiff has incurred and will incur attorneys' fees and litigation costs.

## COUNT II

**Plaintiff v. WAITE, SIMS, and MALGRAT**
**Fourth Amendment (Excessive Force)**
**Pursuant to 42 U.S.C. § 1983**

84.     Paragraphs 1-75 are incorporated herein by reference.

85.     The right to be free from excessive force during a seizure is clearly established. Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir. 2012).

86.     Claims that a police officer used excessive force are analyzed under an "objective reasonableness" standard. See Graham v. Connor, 490 U.S. 386, 388 (1989).

87.     To state a Fourth Amendment claim of excessive force, a Plaintiff must establish that (1) he was seized, (2) he suffered an injury (3) the injury resulted directly from a use of force, and (4) the force used was objectively unreasonable. Flores, 381 F.3d at 396; Tarver v. City of Edna, 410 F.3d 745, 751 (5th Cir. 2005); Bush v. Strain, 513 F.3d 492, 500-01 (5th Cir. 2008).

88.     An objectively reasonable police officer, i.e., a police officer acting in accordance with state and federal law, local and national training standards, and the Key West Police Department's policies and procedures, would have known that (a) seizing HMM, (b) using force against HMM, (c) restricting HMM'S movement, and

15

(d) causing HMM'S continued detention, would violate clearly established law.

89.     Specifically, an objectively reasonable police officer would know that handcuffing an 8 year old boy, who was only approximately 3 feet 6 inches tall, 64 pounds, who posed no threat to himself or others, and who did not present as a flight risk, for the purpose of teaching him a lesson, violated clearly established law and violated the Fourth Amendment as a matter of law. See Gray ex rel Alexander v. Bostic, 458 F.3d 1295 (11th Cir. 2006).

90.     As a direct and proximate result of the Defendants' conduct, HMM suffered and will continue to suffer embarrassment, humiliation, and psychological injury that manifested itself physically, some or all of which may be permanent.

91.     As a direct and proximate result of the Defendants' conduct and the prosecution of this civil litigation, Plaintiff has incurred and will incur attorneys' fees and litigation costs.

## COUNT III

**Plaintiff v. HERIN, SHEER, HENRIQUEZ, WAITE, SIMS, and MALGRAT
Fourth Amendment (Duty to Intervene)
Pursuant to 42 U.S.C. § 1983**

92.     Paragraphs 1-75 are incorporated herein by reference.

93.     HERIN, SHEER, HENRIQUEZ, WAITE, SIMS, and MALGRAT each had a duty to intervene to prevent the other from engaging in unlawful conduct.

94.     HERIN, SHEER, HENRIQUEZ, WAITE, SIMS, and MALGRAT each

had a duty to intervene to prevent the other from causing HMM to unlawfully suffer injury.

95.     HERIN, SHEER, HENRIQUEZ, WAITE, SIMS, and MALGRAT each had a meaningful and appreciable opportunity to intervene to prevent the aforementioned conduct but failed or refused to do so.

96.     As a direct and proximate result of the Defendants' conduct, HMM suffered and will continue to suffer embarrassment, humiliation, and psychological injury that manifested itself physically, some or all of which may be permanent.

97.     As a direct and proximate result of the Defendants' conduct and the prosecution of this civil litigation, Plaintiff has incurred and will incur attorneys' fees and litigation costs.

## COUNT IV

### Plaintiff v. CITY and SCHOOL DISTRICT
### Americans with Disabilities Act

98.     Paragraphs 1-75 are incorporated herein by reference.

99.     Title II of the Americans with Disabilities Act ("ADA") applies to state and local government entities, and, in subtitle A, protects qualified individuals with disabilities from discrimination on the basis of disability in services, programs, and activities provided by state and local government entities.

100.    Title II extends the prohibition on discrimination established by section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 794, to all activities

17

of state and local governments regardless of whether these entities receive Federal financial assistance.

101.   CITY and SCHOOL DISTRICT knew through their employees and agents that HMM suffered from a qualifying disability.

102.   CITY and SCHOOL DISTRICT assumed a duty of care over HMM.

103.   CITY and SCHOOL DISTRICT failed to provide proper policy or training to their agents and employees who they assigned the duty of providing care, custody, and control, over minor disabled students like HMM.

104.   CITY and SCHOOL DISTRICT assigned or otherwise permitted their agents and employees who were not properly trained or supervised regarding HMM's disabilities to provide care, custody, and control, over HMM.

105.   CITY and SCHOOL DISTRICT through their agents and employees failed to accommodate HMM's disability.

106.   Pursuant to the IDEA, HMM was entitled to a free and appropriate public education ("FAPE").

107.   CITY and SCHOOL DISTRICT through the actions of their agents and employees who violated the ADA, deprived HMM of his right to FAPE.

108.   As a direct and proximate result of the Defendants' conduct, HMM suffered and will continue to suffer embarrassment, humiliation, and psychological injury that manifested itself physically, some or all of which may be permanent.

18

109.   As a direct and proximate result of the Defendants' conduct and the prosecution of this civil litigation, Plaintiff has incurred and will incur attorneys' fees and litigation costs.

## COUNT V

**Plaintiff v. CITY and SCHOOL DISTRICT**
**Fourth and Fourteenth Amendments—Municipal Liability**
**Pursuant to 42 U.S.C. § 1983**

110.   Paragraphs 1-75 are incorporated herein by reference.

111.   "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

112.   In addition, a failure to train may give rise to municipal liability if the failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Canton v. Harris, 489 U.S. 378, 388 (1989).

113.   CITY and SCHOOL DISTRICT knowingly failed to maintain policies, practices, and training that met the minimum standards in the industry.

114.   Merely sending a police officer to the academy does not satisfy training obligations.

19

115.     Rather, the CITY remained responsible for ensuring that its police officers were properly trained, remained properly trained, and acted in accordance with said training.

116.     As discussed herein, CITY and SCHOOL DISTRICT maintained policies, practices, and customs, which were the moving force that resulted in HMM'S constitutional rights being violated.

117.     In the alternative, CITY and SCHOOL DISTRICT failed to implement proper policies and training, as discussed herein, which was the moving force that resulted in HMM'S constitutional rights being violated.

118.     As a direct and proximate result of the Defendants' conduct, HMM suffered and will continue to suffer embarrassment, humiliation, and psychological injury that manifested itself physically, some or all of which may be permanent.

119.     As a direct and proximate result of the Defendants' conduct and the prosecution of this civil litigation, Plaintiff has incurred and will incur attorneys' fees and litigation costs.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in her favor as follows:

A.      **Declaratory Judgment:** Providing that the Defendants' individual and collective conduct violated HMM'S Federal Constitutional rights;

B.      **Compensatory Damages:** Including, but not limited to, the monetary value associated with the following: violations of legal rights, emotional distress, emotional injury, loss of liberty, embarrassment, and loss of reputation;

C.      **Punitive damages** as permitted by law;

D.      **Equitable Relief:** A written admission of the allegations stated in the Complaint, an in-person oral apology, and a written admission and apology on the SCHOOL DISTRICT and CITY'S official letterhead;

E.      **Attorney's Fees and Costs**; and

F.      **Discretionary Damages and Relief:** Such other financial or equitable relief that the Court deems reasonable and just.

## Jury Trial Demand

Plaintiff respectfully requests a trial by jury on all claims/issues in this matter that may be tried to a jury.

**Respectfully Submitted,**


**s/ *Devon M. Jacob***                              
**DEVON M. JACOB, ESQUIRE**                **Date: August 10, 2020**
PA Bar ID: 89182
Email: djacob@jacoblitigation.com
**JACOB LITIGATION, INC.**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
Telephone: (717) 796-7733
*Counsel for Plaintiff (Pro Hac Vice to be filed)*


**s/ *Benjamin L. Crump***                          **Date: August 10, 2020**
**BENJAMIN L. CRUMP, ESQUIRE**
Bar ID: 0072583
Email: ben@bencrump.com
**BEN CRUMP LAW, PLLC**
122 S. Calhoun, Street, Tallahassee, FL 32301
Telephone: (844) 638-1822
*Counsel for Plaintiff*